# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JENNY SMITH,

                                                       Case No. 1:14-cv-304

                Plaintiff,                          Bowman, J.

     v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

## MEMORANDUM OPINION

Plaintiff Jenny Smith filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents several claims of error for this Court's review. The Commissioner filed a response, to which Plaintiff filed a reply. The parties have consented to disposition by the undersigned magistrate judge pursuant to 28 U.S.C. §636(c). As explained below, the ALJ's finding will be AFFIRMED, because it is supported by substantial evidence in the administrative record.

### I. Background

On September 24, 2010, Plaintiff filed an application for supplemental security income ("SSI") benefits, alleging a disability onset of July 23, 2010. Her application was denied initially and upon reconsideration, following which Plaintiff sought an evidentiary hearing. A hearing by videoconference was held in Pennsylvania on June 12, 2012, at which Plaintiff appeared with counsel and presented testimony.[1] (Tr. 43-68). Following

---

[1] When Plaintiff filed her initial application and appeared at the evidentiary hearing, she was living in Pennsylvania. However, when she filed the instant complaint she had relocated to Butler County, Ohio.

the hearing, the Administrative Law Judge ("ALJ") obtained testimony from a vocational expert through the use of interrogatories.  (Tr. 36).  On September 24, 2012, ALJ Charles Pankow filed a written decision in which he determined that, despite several severe impairments, Plaintiff remained capable of full-time employment and therefore was not disabled.  (Tr. 22-37).  The Appeals Council denied further review, leaving the ALJ's decision as the Commissioner's last decision.

Born in July 1960, Plaintiff was 52 years old and "closely approaching advanced age" at the time of the ALJ's decision.  She has a high school education, some college, and past relevant work as a baker helper and cashier.  Plaintiff ceased working in January, 2001, more than nine years prior to her alleged disability onset date.[2]  (Tr. 164).  Plaintiff alleges that she sustained a work-related injury to her back and/or neck in 1996.  (Doc. 14 at 5, citing Tr. 478).  On or around 1999, she had spinal fusion surgery performed on C5-C6.  (*Id.*, *see also* Tr. 511).  She alleges that she eventually became disabled in July of 2010 due to a combination of physical and mental impairments, including her longstanding back injury, arthritis, chronic neck, back and shoulder pain, muscular damage limiting movement, bone issues, carpal tunnel syndrome, migraines, and depression and anxiety.  (Tr. 164, 208).

The ALJ agreed that Plaintiff had not engaged in substantial gainful activity since well before her alleged disability onset date, and that she had severe impairments of "status post cervical spine fusion, minimal spondylosis of the cervical spine, mild

[2]Plaintiff's application reflects that she previously filed an application alleging a disability onset date in 2009, but received an adverse decision in April 2010.  (Tr. 152).  While that decision does not appear in the administrative record, it is presumed to be *res judicata*, to the extent that Plaintiff was not disabled through April 2010.  There are additional references to "disability paperwork" in Dr. Scott's records, suggesting that other prior determinations may exist.  (Tr. 414, office note dated 8/17/07).  Dr. Scott appears to have accepted Plaintiff's self-report that she was "not able to work since 2001."  (Tr. 415).

degenerative disc disease of the lumbosacral spine with low back pain, bilateral patella chondromalacia, right carpel tunnel syndrome, mood disorder – not otherwise specified, depression, and anxiety." (Tr. 24). However, he found that Plaintiff's severe impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, a determination that Plaintiff does not challenge here. (*Id.*). Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") for a limited range of light work, as follows:

> [T]he claimant has the residual functional capacity to perform light work…except the claimant can only occasionally perform postural maneuvers such as balancing, kneeling, climbing, crouching, stooping, and crawling; must avoid unprotected heights and dangerous machinery; is restricted to unskilled work; requires a low stress environment defined as few changes in work settings and no fast pace or quota production standards; and can have only occasional contact with the public, coworkers, and supervisors.

(Tr. 27).

Based upon responses to interrogatories provided by the vocational expert, the ALJ found that Plaintiff could perform a number of representative jobs, including sorter, marker, and cleaner. (Tr. 36). There are approximately 1.3 million of those three representative jobs in the national economy, and they also exist in significant numbers in the local economy. Based on the abundance of jobs that Plaintiff could perform, the ALJ found that Plaintiff was not under a disability between September 9, 2010 and the date of his decision. (*Id.*). The Appeals Council denied Plaintiff's request for further review, and she timely filed this judicial appeal.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or

3

mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). In other words, this Court must affirm even if the Court itself might have reached a different conclusion in reviewing the same evidence. As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's

4

impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. §404.1512(a).

### B.  Specific Errors

### 1.  Standards Applicable to Medical Opinion Evidence

Plaintiff first argues that the ALJ failed to give the appropriate weight to the opinion of her treating primary care physician, as well as to the opinions of two Social Security Agency's examining consultants.  Plaintiff's primary care physician and one examining consultant opined that Plaintiff has physical limitations that would preclude all work, and/or that would entitle her to a presumption of disability.  A second examining consultant offered some opinions that were consistent with more severe mental limitations than ultimately determined by the ALJ.  Rejecting those opinions, the ALJ instead adopted the opinions of non-examining consultants when he formulated Plaintiff's RFC and determined that she remained capable of a limited range of "light" work.

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s)

5

is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."  *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

In addition to the guidelines applicable to the evaluation of the opinions of treating physicians, the regulatory framework provides guidelines for the evaluation of the opinions of consulting physicians.  In general, the opinions of a consulting physician or psychologist who has actually examined the plaintiff will be given more weight than that of a non-examining consultant, although only treating physicians are entitled to controlling weight. *See* 20 C.F.R. §404.1527(c)(1) and (c)(2).

Viewed in the context of the referenced legal framework, the ALJ's rejection or discounting of the opinions of a treating physician and two examining consultants invite close scrutiny. However, the regulatory presumptions remain subject to individual variations.  Thus, in *Blakley* the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances," the opinions of non-examining consultants "may be entitled to greater

weight than the opinions of treating or examining sources."  *Blakley*, 581 F.3d at 409,

quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  While an ALJ may

not rejected a treating physician opinion solely based on the conflicting opinions of non-

examining consultants, *see Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365 (6th Cir.

2013), no reversible error occurs when an ALJ determines that a treating physician

opinion is not entitled to controlling weight because it is not well-supported, is internally

inconsistent, and/or is inconsistent with the record as a whole.  In this case, I find no

reversible error.  The ALJ rejected the treating physician's opinions for "good reasons,"

and appropriately supported his analysis and conclusions with reference to substantial

evidence in the record as a whole.

### 2.  Opinions Relating to Physical Limitations

#### a.  Treating Physician Dr. Scott

Dr. Scott has been Plaintiff's primary care physician at least since 2007,[3] and

completed a functional assessment form that – if fully accepted – would have precluded

all work based primarily on physical limitations.  On March 20, 2012, Dr. Scott opined

that Plaintiff can walk 1-2 city blocks without rest or severe pain, can sit 1 hour and

stand only 15 minutes at one time, and can sit and stand/walk less than 2 hours total in

an 8 hour workday. (Tr. 541-545).  Dr. Scott further opined that Plaintiff must walk

around every 15 minutes, needs to be able to sit/stand or walk at will, needs frequent

unscheduled breaks, and that her legs need to be elevated near heart level to reduce

swelling.  (*Id.*).  According to Dr. Scott, Plaintiff requires a cane when walking, can rarely

lift/carry up to 10 pounds, and can rarely twist, stoop, crouch/squat, or climb stairs.

Last, Dr. Scott's functional assessment states that Plaintiff can rarely look up or down,

---

[3]Dr. Scott reports treating Plaintiff since 2007 on her RFC form, but as the ALJ notes, there is some evidence of earlier treatment by Dr. Scott.  (Tr. 30, noting 2005 treatment).

turn her head side-to-side, or hold her head in a static position due to residual pain and limitations from neck surgery. (*Id.*). Dr. Scott believes she will be absent from work more than 4 days per month. (Tr. 544).

The ALJ essentially rejected the entirety of Dr. Scott's functional analysis of Plaintiff's limitations on grounds that her assessment was "*completely inconsistent* with her treatment notes." (Tr. 33). In other words, the ALJ found that Dr. Scott's opinions were not entitled to the "controlling weight" presumption usually given to the opinions of treating physicians, because her opinions were not "well supported" and were inconsistent with both her own records, and with Plaintiff's medical records as a whole. The ALJ explained:

> In the report, Dr. Scott explained that the claimant's pain and psychological symptoms would interfere constantly with concentration and would cause her to be incapable of low stress work. Dr. Scott further explained that the claimant could perform no greater than sedentary exertional demands, would need to shift positions at will during the workday, would require frequent unscheduled breaks…and would be absent more than 4 days per month (Exhibit 20F). Although Dr. Scott's treatment notes reflect regular pain management treatment for cervical and lumbar pain and reflect ongoing treatment for other chronic conditions as described above, Dr. Scott's treatment records contain no reference to any physical or mental activity restrictions minimally close to the exhaustive set of limitations contained in the March 12, 2012 report. If the claimant consistently suffered from the functional limitations provided in the March 12, 2012 report, it is reasonable to expect, at minimum, a similar set of recommended limitations contained in the claimant's progress notes, not only for the claimant's safety but also to prevent any exacerbation of her conditions. The claimant's treatment records, …clearly do not support the extent of limitations identified by Dr. Scott, who did not attempt to reconcile her March 12, 2012 report with the treatment notes from her office. These treatment notes show that the claimant required non-invasive neck treatment following her cervical spine fusion, underwent a March 28, 2006 cervical imaging study that indicated no annular building, no disc herniation, and no spinal stenosis and underwent a June 26, 2009 cervical imaging study that indicated only minimal spondylosis, had conservative treatment for low back pain, underwent a July 3, 2009 treatment for carpel tunnel syndrome, had conservative treatment for bilateral knee pain, and underwent January 20, 2009 and May 19, 2010 imaging studies of the left knee that showed no

acute disease and submitted to an October 6, 2010 imaging study of the bilateral knees that showed no acute disease. Dr. Scott's treatment notes also indicate only intermittent migraine headaches and effective medication management or peptic ulcer disease. Other progress notes from the claimant's psychiatric/psychological specialists demonstrate a favorable response to mental health treatment.

(Tr. 33-34).

The ALJ's analysis is supported by substantial evidence. The ALJ points out that although Dr. Scott's 2012 RFC form depicted Plaintiff as having been disabled for "years" due to impairments that had "[l]asted for years already," (Tr. 541) based upon "severe cervical & lumbar degenerative disc disease," the imaging studies and treatment notes reflected mostly benign and normal findings. The only "severe" findings relate to Plaintiff's area of surgical fusion in 1999, and are noted in imaging studies dated in 2006 and 2007. However, Plaintiff reported that she recovered almost completely from her 1999 surgery, and Plaintiff does not claim to have been disabled prior to July 2010. (Tr. 511). Consistent with that report, the 2006 and 2007 studies reflect mostly normal or mild findings.

Plaintiff complains that the ALJ does not provide "good reasons" for rejecting Dr. Scott's opinions. With regard to Dr. Scott's failure to included "limitations" in her treatment notes, Plaintiff argues that "one rarely encounters" such limitations in medical records, and that the ALJ's criticism amounts to nothing more than "lay advice as to 'best practices' for maintaining medical records." (Doc. 14 at 8). However, not only are Dr. Scott's functional limitations inconsistent with objective evidence such as multiple imaging studies, but as Defendant points out, it is difficult to understand why Dr. Scott's records would have no statements relating to any limitations over the years, particularly when some of the limitations that she claimed in March 2012 that Plaintiff would require presumably would have been therapeutic. For example, even though Dr. Scott opined

9

on the RFC form that Plaintiff would need to elevate her legs above her heart while at work, there is little reference in her clinical records that she advised Plaintiff to keep her legs elevated previously.   Likewise, Dr. Scott in her RFC form stated that Plaintiff would require a cane, but there is little evidence that she prescribed a cane.

Reviewing the entirety of Plaintiff's medical records from Dr. Scott, the undersigned agrees that those records are "completely inconsistent" with the level of disabling functional limitations found by Dr. Scott on the RFC form.   Just one record, dated April 30, 2010 approximately three months prior to Plaintiff's alleged disability onset date, suggests that "elevating legs" was <u>ever</u> prescribed by Dr. Scott as a treatment to prevent swelling.   The same single record notes that Plaintiff has been using a cane at times (apparently of her own volition), and suggests continued use of a cane with "outings." (Tr. 377).   Yet, even that minimal reference to the need for a cane is at odds with Dr. Suvarnakar's observation of a normal gait without the use of an assistive device, achievable heel/toe walking, and full strength in her lower extremities. (Tr. 513-515, 543).   Consistent with the ALJ's RFC findings, Dr. Scott's clinical examinations and treatment notes as a whole were largely unremarkable, documenting chronic conditions but relatively few abnormalities.

Plaintiff complains vigorously that the ALJ "mischaracterized" her treatment as "conservative," because Dr. Scott referred her on occasions to "at least three specialists for consultations regarding her knee and neck pain."[4]   Again, I find no error.  Following her cervical spine fusion of two vertebrae more than a decade prior to her disability

---

[4]Notably, Plaintiff fails to support her arguments with specific citations, leaving the undersigned to guess which "specialists" examined Plaintiff on what dates, and/or what those specialists may have determined. Plaintiff references a smattering of records in one portion of her Statement of Errors, but most precede Plaintiff's alleged disability onset date by several years, and Plaintiff fails to link the list of records to any specific arguments concerning her limitations.  (*See generally*, Doc. 15 at 5).

onset date, Plaintiff did not require any further invasive treatment. A June 2009 cervical imaging study indicated only minimal spondylosis, and a July 2010 lumbar imaging study – corresponding with her disability onset date - similarly revealed only mild degenerative curve. (Tr. 279, *see also* Tr. 308-311). While it is true that Plaintiff was referred several times for imaging studies of her knees and/or hips, those studies, dated in January 2009, May 2010, and October 2010, were essentially normal, with no findings of acute disease or deformities that would support <u>any</u> limitations, much less the extreme limitations that Dr. Scott opined were necessary. (*See* Tr. 250, 276, 304-305, 506, 508). Plaintiff argues that she also received right wrist injections, was referred for physical therapy, received a TENS unit, and tried numerous medications over the years. However, Plaintiff fails to cite to relevant supporting records.[5] As previously noted, most if not all of the treatments occurred years prior to Plaintiff's alleged disability onset date, at a time that Plaintiff does not allege that she was disabled.[6] Plaintiff protests that Dr. Scott completed a form for Plaintiff opining that she required a DMV disability parking placard. (Tr. 376-377). However, the ALJ was correct to reason that determination is vastly different than the criteria used for purposes of determining disability under social security regulations.

Last, Plaintiff complains that the ALJ failed to explicitly consider and

---

[5]In independently reviewing Plaintiff's records, the undersigned notes that it is apparent that Plaintiff did little to follow up on some of the treatments for which she was referred. For example, although Plaintiff was referred for a six-week course of physical therapy for pain, beginning in June 2010, she was discharged for noncompliance in July, having repeatedly cancelled or failed to show for multiple appointments. (Tr. 285-286, 293).

[6]The undersigned assumes Plaintiff is relying on either a March 28, 2006 CT scan or a June 8, 2007 CT image of her cervical spine as evidence of "severe degenerative arthritis with fusion of…C5 and C6," including some "apical thickening and scarring" from the 1999 surgery. Again, both reports – some three and four years prior to Plaintiff's disability onset date – reflect mostly normal findings with only "mild" abnormalities or degenerative changes. (*See* Tr. 350-351, 367).

acknowledge that Dr. Scott's postural limitations were "remarkably consistent" with the RFC opinions of Dr. Suvarnakar, the agency's examining consultant. Plaintiff complains that the ALJ's rejection of the postural limitations on which the two physicians agreed resulted in an improper determination that Plaintiff could perform a range of "light work" rather than, at most, sedentary work. If the ALJ had limited Plaintiff to sedentary work, she would have been presumptively disabled under the Medical-Vocational Guidelines, Rule 201.12, based upon her age and unskilled work level. As explained below, the undersigned finds no error in the ALJ's failure to specifically note the similarity or consistency between the postural limitations offered by Drs. Scott and Suvarnakar, because substantial evidence in the record as a whole supports the ALJ's rejection of those limitations.

### b. Agency Consultant Dr. Suvarnakar

Following a May 9, 2011 consulting examination, Dr. Suvarnakar diagnosed cervical disc disease, lumbar back syndrome, GERD, arthritis in the knees, chronic balancing problems, and asymptomatic psoriatic patches. Completing an RFC evaluation, Dr. Suvarnakar opined that Plaintiff could lift and carry only 5-10 pounds, could stand and walk 1-2 hours in an 8-hour workday, and could sit 2-3 hours, with unspecified mild limitations pushing and pulling. (Tr. 517). The portions of the RFC form completed by Dr. Suvarnakar that asks for "supportive medical findings, if not otherwise included in the report" is left blank, but a narrative examination report is attached. The RFC form offers few additional limitations. For example, Dr. Suvarnakar opines that Plaintiff can "frequently" bend, kneel, stoop, crouch, balance, and climb, and lists "no" limitations for reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling, continence. He also lists "no" environmental restrictions. (Tr. 521). In

his examination report, Dr. Suvarnakar reports that after her 1999 cervical fusion surgery, Plaintiff experienced an "almost complete recovery and…full range of motion at the cervical area by 2000." (Tr. 511). At the appointment, she "walk[ed] to my office in no apparent acute distress." (Tr. 513). Her neck was "supple," with "no cervical lymphadenopathy [or] thryomegaly." (Tr. 514).

Plaintiff's primary complaint is that she is disabled due to pain from her musculoskeletal disease. However, Dr. Suvarnakar noted that her cervical spine exam was "normal," other than her surgical scar. Specifically, he noted her range of motion "is essentially normal with a mild degree of pain on lateral gaze." Her thoracic and lumbar spine exams were also "normal," with only "very minimal tenderness in paraspinous muscles," and "achievable" heel and toe walking. (Tr. 514). Plaintiff's shoulder, elbow, wrist, and hand, and ankle, foot and thigh examinations were all "essentially normal." Her knees had "a full range of motion" with "normal examination." (Tr. 513). She had normal strength in her upper and lower extremities, with no loss of muscle mass or other abnormalities found at all. (*Id.*). Her gait was also "normal." (*Id.*).

Despite these normal findings, Dr. Suvarnakar's report opined that standing, walking, and sitting were "around one to three hours." (Tr. 515). As the ALJ pointed out, these significant postural limitations appear to be completely at odds with the multiple normal findings, including a normal range of motion, and only "very minimal tenderness" in Plaintiff's lumbar spine. Nor are the postural limitations supported by imagining studies or other objective evidence. Dr. Suvarnakar states simply in his report that "[b]ack pain and neck pain seems to be the [basis for] limitations." Yet very little pain or tenderness was found on examination. His final diagnosis was only "mild"

13

arthritis of the knees, and lumbar "low back pain syndrome, most likely biomechanical." (Tr. 515).

In rejecting Dr. Suvarnakar's opinions, the ALJ noted "the lack of detail" such as Dr. Suvarnakar's failure to "specifically define the claimant's ability to lift and carry frequently or occasionally," and failure to "describe the nature and degree of pushing and pulling limitations." (Tr. 34). Plaintiff argues that Dr. Suvarnakar's lack of specificity on lifting/carrying and pushing/pulling is irrelevant, since he did specify that Plaintiff was restricted to lifting/carrying 5-10 pounds, and provided specific postural restrictions.

However, the ALJ also pointed out that "Dr. Suvarnakar's report is not supported consistently by his observations." (*Id.*). For example, "[h]e limited the claimant to standing and walking 1 to 2 hours, but…found only mild arthritis of the knees and normal range of motion in both knees." (*Id.*). Similarly, he "restricted the claimant to sitting 2 to 3 hours…and found…limited range of motion with lumbar forward flexion," but inconsistently "observed that the claimant had minimal tenderness in her lumbar paraspinous muscles, exhibited 5/5 strength in the lower extremities, and walked with a normal gait." (Tr. 34-35). Finally, the ALJ pointed out Dr. Suvarnakar's many "unremarkable objective findings," such as a "normal" cervical spine, with "an almost complete recovery from prior [spine] surgery, that she could heel and toe walk, that she walked with a normal gait, that she had normal hips, ankles, and feet, and that she exhibited no muscle atrophy." (Tr. 35). Dr. Suvarnakar found "no pitting edema or calf tenderness,…normal shoulders, wrists, elbows, and hands, …[and that she] seemed to have intact memory, had 5/5 strength in the upper extremities, and had intact sensory function. (*Id.*). Thus, the ALJ's primary reason for discounting Dr. Suvarnakar's RFC opinions was that they were inconsistent with his examination findings. Substantial

evidence has been described as "a fairly low bar," *Hickey-Haynes v. Barnhart*, 116 Fed. Appx. 718, 726 (6th Cir. 2004), consisting of "more than a scintilla but less than a preponderance" of evidence.  *Norman v. Astrue*, 694 F. Supp.2d 738, 740 (N.D. Ohio 2010)(citing *Richardson v. Perales*, 402 U.S. at 401)).  The ALJ's rejection of the extreme postural limitations in the face of myriad "normal" or only "mild" clinical findings by Dr. Suvarnakar is easily supported by substantial evidence.

### c.  Non-examining Agency Consultant Dr. Ali

Rather than relying on Dr. Scott or Dr. Suvarnakar's opinions to formulate Plaintiff's RFC, the ALJ gave the most weight to the May 31, 2011 RFC opinions of a non-examining social security consultant, Dr. Ali.  Dr. Ali opined that Plaintiff could occasionally lift up to 20 pounds, consistent with light work, could frequently lift 10 pounds, and could stand and/or walk for up about 6 hours rather than only 2-3 hours in an 8-hour workday.  Dr. Ali further opined that Plaintiff could sit for about 6 hours in an 8-hour day, and that her ability to push and/or pull was unlimited.  Some of Dr. Ali's opinions were more restrictive than Dr. Suvarnakar.  For example, while Dr. Suvarnakar believed that Plaintiff could "frequently" climb, balance, stoop, kneel, crouch and crawl, Dr. Ali opined that Plaintiff could only "occasionally" perform such activities.  The ALJ credited Dr. Ali's more restrictive opinion on that issue.

Dr. Ali specifically considered Dr. Suvarnakar's opinions, including his examination report. However, Dr. Ali did not agree that Plaintiff would have the extreme postural limitations found by Dr. Suvarnakar.  Dr. Ali pointed to the clinical examination findings of few abnormalities, and considered Plaintiff's medical history, her reported activities of daily living, and other objective medical records that offered no support for extreme limitations and showed an "almost complete recovery" from her 1999 surgery.

(Tr. 530). Dr. Ali pointed out that Plaintiff's "medical records reveal that the medications have been relatively effective in controlling [Plaintiff's] symptoms." (Tr. 531). Based on the record as a whole, Dr. Ali found Plaintiff's statements to be only "partially credible." While Plaintiff offers a contrary interpretation of some of the same evidence, the ALJ's analysis, including his adoption of Dr. Ali's RFC opinions, is supported by substantial evidence.

In her reply memorandum, Plaintiff seems to add a new argument that the ALJ's reliance on Dr. Ali constitutes error because he could not possibly have reviewed the entirety of Plaintiff's records, including Dr. Scott's March 2012 RFC report. In *Blakley,* the Sixth Circuit reversed on grounds that the state non-examining sources did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions. *Blakley*, 581 F.3d at 409 (*quoting Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007)). Under *Blakley*, then, an ALJ may choose to credit the opinion of a non-examining consultant like Dr. Ali who has failed to review a complete record, but he should articulate his reasons for doing so. If he fails to provide sufficient reasons, his opinion still may be affirmed if substantial evidence supports the opinion and any error is deemed to be harmless or *de minimis.*

Because it is arguably presented for the first time in Plaintiff's reply memorandum, this Court need not consider this new *Blakley* argument. Even fully considering the argument, however, the Court finds no grounds for remand. Neither the number or content of medical records that post-dated Dr. Ali's May 31, 2011 report was nearly as extensive in this case as in *Blakley*. Indeed, the most significant "new" item

16

appears to have been Dr. Scott's March 2012 report, which the ALJ himself fully considered. The ALJ explained that he had determined that Dr. Ali's opinions "are consistent generally with the medical evidence and with the claimant's course of treatment as set forth above indicating intermittent migraine headaches, effective medication management of peptic ulcer disease, non-invasive neck treatment following her cervical spine fusion, conservative treatment for low back pain and bilateral knee pain, and minimally invasive treatment for carpel tunnel syndrome." (Tr. 30). Most importantly, the ALJ extensively discussed the entirety of Plaintiff's medical records, including the post-May 2011 "completely inconsistent" records and opinions of Dr. Scott. To the extent any error is evident, it was clearly harmless on the record presented.

### d. Migraine Headaches

Within a section asserting error concerning the ALJ's assessment of her mental limitations, Plaintiff presents a separate claim of error regarding the ALJ's assessment of her migraine headaches. Plaintiff first argues that the ALJ erred by concluding that her headaches were a "non-severe impairment." (Tr. 25). However, any possible error at Step 2 does not provide grounds for remand in this case, because the ALJ proceeded through the subsequent stages of the sequential analysis. *See Mariarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Pompa v. Com'r of Soc. Sec.*, 73 Fed. Appx. 801, 803 (6th Cir. 2003).

Plaintiff also complains that the ALJ's analysis was inconsistent, to the extent that he limited her to unskilled work in part "to account for concentration issues caused by headache-related pain." (Tr. 25). Contrary to Plaintiff's argument, it is appropriate – indeed required – for an ALJ to consider both non-severe and severe impairments when formulating a claimant's RFC.

17

Plaintiff generally argues that the evidence reflects that she experienced severe migraine headaches over a long period of time, that responded poorly to treatment, and that ultimately should have resulted in a finding of disability. In one of the few times that she supports her argument with specific citations to the record, she points to records reflecting that she reported chronic headache pain since at least September 2006. (See Tr. 373, dated 9/4/10; Tr. 379, dated 3/10/10; and Tr. 431, dated 9/12/06). Dr. Scott prescribed her medications during a September 2006 appointment and on July 31, 2009, Dr. Scott increased Plaintiff's does of Pamelor. In March 2010, Plaintiff indicated she was taking up to 4 Fioricet per day to manage her headaches, and on September 14, 2010, Plaintiff complained of daily headaches which Dr. Scott suspected were rebound headaches from overuse of medication. (Tr. 373). Dr. Scott advised Plaintiff to taper her dose of Fioricet, and started Plaintiff on Imitrex for migraines on November 1, 2011. (Tr. 535).

The ALJ reasoned that based on his review of the medical records, including "progress notes from 2007, 2008, and 2009, Dr. Scott did not indicate that the claimant suffered headaches multiple times per week." (Tr. 25, citing 384-429). Plaintiff undoubtedly complained of chronic pain, but at many appointments, including in some of the specific records cited by Plaintiff, headaches were not noted at all. (*See, e.g.,* Tr. 386, dated 7/31/09; Tr. 395, dated 11/07/08; Tr. 429, dated 12/14/06).

During the hearing, Plaintiff testified that she has suffered from migraines her entire life, since the age of 7, and claimed to experience "20 to 25 migraine headaches per month that last from 2 to 6 days." (Tr. 60-62). However, that frequency and severity was not reflected in the medical records. (Tr. 25, 28). Plaintiff testified that her headaches have worsened since she stopped working in 2000. However, as Defendant

points out, it was reasonable for the ALJ to discredit Plaintiff's testimony on the severity and frequency of her headaches, not only because the medical records did not support her claims but because on the low end of her estimate, 20 headaches of 2 days duration each would be mathematically impossible in a single month.   The ALJ pointed out that while Plaintiff discussed her chronic headaches in early 2010, Dr. Scott did not modify her treatment regimen until September 2010 when she suggested that Plaintiff's headaches were likely caused by Fioricet overuse.   After changing medications, Dr. Scott's notes do not reflect multiple weekly headaches in 2011.   In fact, during her examination with Dr. Suvarnakar, Plaintiff did not report any migraine headaches, but instead reported that she only "occasionally gets into sinus headache."  (Tr. 513).  And, as the ALJ noted, Plaintiff has not required hospital visits or even a referral to a specialist for her headaches.   In short, the undersigned finds substantial evidence to support the ALJ's conclusion that Plaintiff's headaches may interfere slightly with concentration, but are not disabling.

### 3.  Opinions Relating to Mental Limitations

Plaintiff underwent a January 7, 2011 psychological examination by Dr. Clark.  At the conclusion of that consultative examination, Dr. Clark diagnosed Plaintiff with depression, generalized anxiety disorder, and specific phobia.  Dr. Clark also completed an RFC questionnaire regarding Plaintiff's mental limitations.   Dr. Clark opined that Plaintiff had "slight" restrictions in her abilities to understand and remember short, simple instructions, to interact appropriately with the public, her supervisors, and co-workers, and "moderate" restrictions in her abilities to carry out short, simple instructions, and make judgments on simple work-related decisions. (Tr. 482).  In a narrative portion, Dr. Clark notes that Plaintiff is limited by chronic physical pain, but

19

remarks:  "Client can carry out simple chores at home while working at a slow pace." (Tr. 482).  In contrast to her slight to moderate abilities to recall and carry out simple instructions, Dr. Clark opined that Plaintiff would have "marked" restrictions in her abilities to understand and remember detailed instructions, carry out detailed instructions, or to respond appropriately to work pressures in a usual work setting.  (Tr. 482).  Finally, he opined that Plaintiff would have "extreme" restriction in the single area of "respond[ing] appropriately to changes in a routine work setting."  (*Id.*).  In the narrative portion, Dr. Clark notes that Plaintiff "experiences some difficulty coping/functioning when depressed," referring to her prior difficulty changing jobs during her employment at Walmart because of the demands of the jobs and her pain.  (*Id.*).  In the section asking what "findings" support his assessment, Dr. Clark explicitly cites his reliance on Plaintiff's "self report."  (Tr. 483).

The ALJ reviewed Plaintiff's mental health treatment, beginning with psychotropic medications prescribed by Dr. Scott, and counseling and medication management through Bright Horizons in 2009, noting Plaintiff's consistent improvement with therapy and drug treatment.  (Tr. 30-31, noting "favorable response to …treatment.").  Two therapists assessed Plaintiff with "only moderate symptoms and moderate difficulties in social or occupational functioning" in both 2009 and 2010, and no mental health specialist opined that Plaintiff was unable to handle basic demands of "simple" work activities.  (Tr. 30).  The ALJ gave "great weight" to Dr. Clark's findings and opinions that Plaintiff would have only slight or moderate limitations in most areas regarding "simple" work.  However, the ALJ gave "less weight" to the handful of opinions from Dr. Clark that Plaintiff would suffer from "marked" or "extreme" limitations.

Plaintiff argues that the reasons given by the ALJ for discounting some of Dr.

Clark's opinions were not "good reasons" as required under social security regulations. It is worth noting that the more explicit "good reasons" standard applies only to an ALJ's rejection of the opinions of a treating physician, and does not apply to the rejection of the opinions of a consulting physician or psychologist. Regardless, the ALJ adequately explained his reasons for giving less weight to a portion of Dr. Clark's opinions, and provided additional explanation to underscore how he believed the mental RFC limitations that he determined still took into account Dr. Clark's more severe limitations.

The ALJ did not discount Dr. Clark's more limiting opinions entirely, but instead found that the three areas of "marked" limitations "appear to be outlier opinions and are not supported by the bulk of Dr. Clark's other opinions reflecting mostly moderate or lesser limitations." The ALJ further found the "marked" areas of limitation to be inconsistent with Plaintiff's overall Global Assessment of Functioning Score of 55,[7] and inconsistent with other medical opinions that Plaintiff had no more than moderate limitations in all areas of functioning. Nevertheless, the ALJ stated that he had taken into consideration Dr. Clark's opinions that Plaintiff would have "marked" limitations in three areas dealing with detailed instructions and work pressures, by limiting her to unskilled work with no fast pace or quota production standards. (Tr. 31).

In addition to partially relying on Dr. Clark, the ALJ based Plaintiff's mental RFC limitations upon the opinions of a non-examining consultant, Douglas Schiller, Ph.D. Dr. Schiller completed a mental RFC form on January 24, 2011 in which he reviewed Dr. Clark's report, but partially disagreed with Dr. Clark's more severe mental RFC

---

[7]Plaintiff argues that a GAF score of 55 "*actually describes* someone who is *somewhere between* having serious limitations and moderate limitations." (Doc. 14 at 14). Contrary to Plaintiff's assertion, a GAF score in the range of 51-60 generally indicates no more than moderate limitations, consistent with an ability to work. *See Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000). In any case, GAF scores do not correspond precisely with work abilities. While an ALJ may consider such scores, he or she is not required to rely upon them as evidence of disability. *See Howard v. Com'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).

limitations. Dr. Schiller opined that Plaintiff had only mild restrictions in her activities of daily living, and that she would have no more than moderate difficulties in all other areas. (Tr. 31-32). Dr. Schiller's report therefore adds to the substantial evidence in the record as a whole that supports the ALJ's findings that Plaintiff's impairments cause no more than "moderate" limitations.

### 4. Credibility and Pain Complaints

As reflected above, Plaintiff's disability claim in this case primarily rests upon chronic pain complaints that are not well-supported by objective evidence. Subjective complaints of pain may support a claim for disability. *See Duncan v. Sec'y of HHS*, 801 F.2d 847, 852 (6th Cir. 1986). However, in cases in which complaints of disabling pain are not well-supported by medical evidence, the credibility of the claimant is often critical. *See Tyra v. Sec'y of HHS*, 896 F.2d 1024, 1030 (6th Cir. 1990)(Though claimant's physicians consistently reported Tyra's subjective complaints of pain, he had no underlying neurological abnormalities, atrophy or proportionate loss of sensory and reflex reactions."); *Daniels v. Com'r of Soc. Sec.*, 2011 WL 2110145 at*4 (S.D. Ohio May 25, 2011)(normal neurological findings or other results of objective testing may be considered in determining credibility of subjective complaints, citing *Cross v. Com'r of Soc. Sec.*, 373 F. Supp.2d 724, 732 (N.D. Ohio 2005)).

Here, the ALJ found that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms,… the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the RFC determined by the ALJ. (Tr. 28). Plaintiff does not directly challenge the ALJ's negative assessment of her credibility, but nearly all of her arguments indirectly do so. An ALJ's credibility

assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

It is clear that the ALJ had concerns about the Plaintiff's credibility. He specifically points out inconsistencies which "do not weigh in favor of her credibility about the extent of her symptoms and limitations…." For example, despite her claims of being severely limited in work-related abilities, she testified to "a wide range of activities including dressing, bathing, and caring for her hair independently without significant problems, feeding and bathing her dogs, preparing full meals and homemade sauces, performing most of the housework, doing laundry, vacuuming, shopping in stores for groceries, watching television, reading books, spending time with others, and teaching her teenage goddaughter how to cook." (Tr. 32). She had no difficulties using the bathroom, taking care of personal needs and grooming, going outside alone, paying bills, managing money, following recipes, creating her own recipes, or going places without accompaniment. (Tr. 32).

As other courts have noted, many people experience chronic pain that is less than disabling. *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 230-231 (6th Cir. 1990)(affirming ALJ's determination that back pain from nerve root

compression and herniated disc, coupled with degenerative changes, was not disabling).   In fact, Plaintiff's pain complaints have long preceded her alleged disability onset date. While Plaintiff testified that her symptoms have worsened over time, the ALJ reasonably discounted the credibility of her testimony based upon her medical records, daily activities, and other evidence of record.   *See* 20 C.F.R. §404.1529(c)(3)(daily activities may be useful to assess nature and severity of symptoms).   Thus, to the extent Plaintiff indirectly challenges the assessment of her credibility, the Court finds no error in the ALJ's assessment of Plaintiff's subjective pain complaints, which was supported by the record as a whole.

### III.  Conclusion and Recommendation

For the reasons discussed above, **IT IS ORDERED THAT** Defendant's decision be **AFFIRMED** and that this case be **CLOSED**.


 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge